ALDEN M. LEIB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10688-85.          Filed June 16, 1987.

*Joseph F. Dillon, R. Peter Prokop, George J. Haddad,* and *Robert E. Forrest,* for the petitioner.
*Roberta M. Hamm,* for the respondent.

GOFFE, *Judge*: The Commissioner determined that petitioner was liable for the excise tax imposed by section 4975(a)[1] in the amount of $7,787.50 for each of the taxable years 1980 and 1981. The issues for decision are: (1) Whether the tax provided in section 4975(a) should be imposed when a prohibited transaction would qualify as a prudent investment if judged under the highest fiduciary standards; (2) whether petitioner is liable for the tax imposed by section 4975(a) for both of the taxable years 1980 and 1981; and (3) whether respondent correctly determined the amount involved for purposes of computing the tax imposed by section 4975(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.

Petitioner Alden M. Leib resided in Farmington Hills, Michigan, at the time he filed his petition in this case. Petitioner is a dentist specializing in the practice of periodontics. Petitioner has been engaged in the private practice of periodontics since 1966. Since 1969, petitioner has conducted his private practice through a professional corporation known as Alden M. Leib, D.D.S., M.S., P.C. Petitioner owns 100 percent of the stock of the professional corporation. In 1980, the professional corporation had approximately 20 employees. The professional corporation established the Alden M. Leib, D.D.S., M.S., P.C. Employees Pension Trust (the trust) in 1969. Petitioner has been the trustee since its inception. As of the time of trial, approximately 15 individuals had vested amounts in the trust.

By the fall of 1980, petitioner had accumulated a block of stock in Cunningham Drug Stores, Inc. (Cunningham), a retail drug store chain whose stock was traded on the New York Stock Exchange. On November 18, 1980, the Detroit Free Press published an article stating that a group of New York investors had purchased approximately 32 percent of the outstanding stock of Cunningham on November 14, 1980, for $18 per share. The article stated that the owners of the remaining shares would be offered the same price in proxy materials to be sent out by mid-December.

On December 12, 1980, petitioner sold 8,900 shares of Cunningham stock to the trust for $17.50 per share for a total price of $155,750. Petitioner determined that $17.50 per share was the amount the trust would have to pay to purchase the stock on the open market. In payment for the stock, petitioner received a check in the amount of $25,750 and a promissory note in the amount of $130,000 from the trust. The note was payable on demand and was non-interest-bearing.

On January 30, 1981, an article published in the Detroit Free Press stated that the shareholders of Cunningham had approved the sale to the New York investors on January 29, 1981, and that the shareholders would receive $18 per share by February 20, 1981. On February 20, 1981, the trust sold the 8,900 shares of Cunningham stock to the New York investors for $18 per share for a total selling price of

$160,200. On February 27, 1981, the $130,000 promissory note issued to petitioner by the trust was paid in full.

In December 1981, petitioner determined that the price at which he sold the stock to the trust exceeded by $0.50 per share the price that the trust would have had to pay had it purchased the stock on the open market and paid commissions on the purchase. On December 15, 1981, petitioner paid the trust $4,450, or $0.50 on 8,900 shares.

On March 8, 1985, the Commissioner mailed a statutory notice of deficiency to petitioner in which he determined that petitioner entered into a prohibited transaction under section 4975(a) when he sold his Cunningham stock to the trust. The deficiency is in the amount of $7,787.50 for each of the taxable years 1980 and 1981. The deficiency equals 5 percent of $155,750, the total consideration received by petitioner.

## OPINION

Section 4975(a) imposes an excise tax equal to 5 percent of the amount involved with respect to a prohibited transaction for each year (or part thereof) in the taxable period. A prohibited transaction includes any direct or indirect sale or exchange, or leasing, of any property between a plan, as defined in section 4975(e)(1), and a disqualified person. Sec. 4975(c)(1)(A). A disqualified person includes an owner of 50 percent or more of the stock of a corporation which is an employer any of whose employees are covered by the plan. Sec. 4975(e)(2)(C) and (E). The excise tax is payable by the disqualified person who participates in the prohibited transaction. Sec. 4975(a).

Petitioner concedes that he is a disqualified person and that the sale of the Cunningham stock to the trust constituted a prohibited transaction. However, petitioner contends that the section 4975(a) excise tax should not be imposed when a transaction would qualify as a prudent investment if judged under the highest fiduciary standards. Respondent contends that whether the prohibited transaction represents a prudent investment or benefits the plan is irrelevant. We agree with respondent.

To evaluate the contention of petitioner, we look initially to the express language and framework of the statute.

Section 4975 was added to the Internal Revenue Code by title II of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 2003, 88 Stat. 829, 971.[2] In section 4975(c)(1)[3] Congress specifically enumerated six categories of prohibited transactions. Section 4975(c)(1) does not include a prudent investment standard or provide that an otherwise prohibited transaction is not prohibited if it benefits the plan.

In section 4975(d), however, Congress did provide for the exemption of certain transactions from the broad reach of section 4975(c).[4] For instance, although section 4975(c)(1)(B) provides that the lending of money or other extension of credit between a plan and a disqualified person is a prohibited transaction, section 4975(d)(1)[5] provides that section 4975(c) shall not apply to a loan made by the plan to a disqualified person who is a beneficiary of the plan if, among other requirements, such loan is available to all

---

[2]Title I of ERISA sets forth guidelines and standards governing the establishment and operation of pension plans and also establishes general standards of conduct for plan fiduciaries. See generally ERISA sec. 2 et seq., 88 Stat. 832 et seq. The Department of Labor is given principal authority to administer and enforce the provisions of title I. See generally ERISA sec. 501 et seq., 88 Stat. 891 et seq. Title II of ERISA specifically amends the Internal Revenue Code of 1954. See generally ERISA sec. 1001 et seq., 88 Stat. 898 et seq.

[3]Sec. 4975(c)(1) provides:

(1) GENERAL RULE.—For purposes of this section, the term "prohibited transaction" means any direct or indirect—
    (A) sale or exchange, or leasing, of any property between a plan and a disqualified person;
    (B) lending of money or other extension of credit between a plan and a disqualified person;
    (C) furnishing of goods, services, or facilities between a plan and a disqualified person;
    (D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;
    (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
    (F) receipt of any consideration for his own personal account by any disqualified person who is fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

[4]Petitioner does not contend that the sale of Cunningham stock to the trust comes within an exemption set forth in sec. 4975(d).

[5]Sec. 4975(d)(1) provides:

(d) EXEMPTIONS.—The prohibitions provided in subsection (c) shall not apply to—
    (1) any loan made by the plan to a disqualified person who is a participant or beneficiary of the plan if such loan—
        (A) is available to all such participants or beneficiaries on a reasonably equivalent basis,
        (B) is not made available to highly compensated employees, officers, or shareholders in an amount greater than the amount made available to other employees,
        (C) is made in accordance with specific provisions regarding such loans set forth in the plan,
        (D) bears a reasonable rate of interest, and
        (E) is adequately secured;

beneficiaries on a reasonably equivalent basis, bears a reasonable rate of interest, and is adequately secured.[6] Furthermore, section 4975(c)(2)[7] provides that the Secretary,[8] after extensive publication and hearing procedures, may exempt a disqualified person or transaction from the restrictions imposed by section 4975(c)(1).[9]

The language and statutory framework of section 4975 indicate an intent to create, in section 4975(c)(1), a blanket prohibition against certain transactions, regardless of how prudent the transaction or whether the plan benefited therefrom, unless the transaction came within a statutory exemption or an administrative exemption had been granted.

In addition, the committee reports accompanying ERISA indicate that Congress intended to unconditionally prohibit certain transactions irrespective of the prudence of the transaction or whether the plan benefited therefrom. The Senate Finance Committee report provides as follows:

---

[6]Sec. 4975(d)(13) exempts any transaction which is exempt from ERISA sec. 406 by reason of ERISA sec. 408(e). ERISA sec. 408(e) provides that ERISA sec. 406 shall not apply to the acquisition or sale by a plan of employer stock or marketable obligations if certain requirements are met. *Capital City Excavating Co. v. Commissioner*, T.C. Memo. 1984-193.

[7]Sec. 4975(c)(2) provides:

(2) SPECIAL EXEMPTION.—The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any disqualified person or transaction or class of persons or transactions, from all or part of the restrictions imposed by paragraph (1) of this subsection. Action under this subparagraph may be taken only after consultation and coordination with the Secretary of Labor. The Secretary may not grant an exemption under this paragraph unless he finds that such exemption is—

(A) administratively feasible,
(B) in the interests of the plan and of its participants and beneficiaries, and
(C) protective of the rights of participants and beneficiaries of the plan.

Before granting an exemption under this paragraph, the Secretary shall require adequate notice to be given to interested persons and shall publish notice in the Federal Register of the pendency of such exemption and shall afford interested persons an opportunity to present views. No exemption may be granted under this paragraph with respect to a transaction described in subparagraph (E) or (F) of paragraph (1) unless the Secretary affords an opportunity for a hearing and makes a determination on the record with respect to the findings required under subparagraphs (A), (B), and (C) of this paragraph, except that in lieu of such hearing the Secretary may accept any record made by the Secretary of Labor with respect to an application for exemption under sec. 408(a) of title I of the Employee Retirement Income Security Act of 1974.

[8]Pursuant to Reorganization Plan No. 4 of 1978, 92 Stat. 3790, authority to issue exemptions under sec. 4975(c)(2) has been transferred to the Secretary of Labor.

[9]Petitioner stated on brief that he had filed a request with the Department of Labor for a retroactive exemption. The exemption was denied and petitioner contends that the denial was arbitrary and capricious. The propriety of the denial is not before us.

Currently, transactions generally are prohibited when the dealings involved are on other than an arm's-length basis. However, arm's-length standards require substantial enforcement efforts, resulting in sporadic and uncertain effectiveness of these provisions. This is the same problem which was faced by the Congress in 1969 when it acted with respect to prohibited transactions and private foundations. At that time the Congress concluded that in most cases arm's-length standards did not preserve the integrity of private foundations, and amended these definitions of prohibited transactions for the most part to prohibit outright questionable transactions between the trust and interested parties. The committee's bill generally follows the approach that was developed in 1969, * * * [S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 174.]

ERISA section 406 (part 4 of title I) which generally parallels section 4975(c)(1), defines and proscribes certain prohibited transactions in which plan fiduciaries are not to engage. H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 467. The Conference report provides as follows:

The labor provisions deal with the structure of plan administration, provide general standards of conduct for fiduciaries,[10] and make certain specific transactions "prohibited transactions" which plan fiduciaries are not to engage in. The tax provisions include only the prohibited transaction rules and apply only to disqualified persons, not fiduciaries (unless the fiduciary is otherwise a disqualified person and the transaction involved him, or the fiduciary benefited from the transaction). To the maximum extent possible, the prohibited transaction rules are identical in the labor and tax provisions, so they will apply in the same manner to the same transaction. * * * [H. Rept. 93-1280 (Conf.)(1974), 1974-3 C.B. at 456-457.]

Thus, the case law interpreting ERISA section 406 is instructive with regard to interpreting the prohibited transaction provisions of section 4975. *Calfee, Halter & Griswold v. Commissioner*, 88 T.C. 641 (1987).

ERISA section 406 has been uniformly interpreted as a per se prohibition of the transactions defined therein. *Donovan v. Cunningham*, 716 F.2d 1455, 1464-1465 (5th Cir. 1983);

---

[10]It should be emphasized that fiduciaries should be distinguished from disqualified persons. ERISA sec. 404 (part 4 of title I) provides that fiduciaries are to discharge their duties in accordance with a prudent man standard of care. The Conference report provides that to the extent a fiduciary meets the prudent man rule of the labor provisions, he will be deemed to meet these aspects ("cost must not exceed fair market value at the time of purchase, there must be a fair return commensurate with the prevailing rate, sufficient liquidity must be maintained to permit distributions, and the safeguards and diversity that a prudent investor would adhere to must be present") of the exclusive benefit requirement under the Code. H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 463.

*Donovan v. Mazzola,* 716 F.2d 1226, 1237-1238 (9th Cir. 1983); *M & R Investment Co. v. Fitzsimmons,* 685 F.2d 283, 287 (9th Cir. 1982); *Cutaiar v. Marshall,* 590 F.2d 523, 529 (3d Cir. 1979); *Donovan v. Walton,* 609 F. Supp. 1221, 1246 (S.D. Fla. 1985); *McDougall v. Donovan,* 552 F. Supp. 1206, 1215 (N.D. Ill. 1982); *Freund v. Marshall & Ilsley Bank,* 485 F. Supp. 629, 637 (W.D. Wis. 1979); *Marshall v. Kelly,* 465 F. Supp. 341, 354 (W.D. Okla. 1978). As the Fifth Circuit in *Donovan v. Cunningham, supra,* stated:

> The object of Section 406 was to make illegal per se the types of transaction that experience had shown to entail a high potential for abuse. In the complex setting of employee benefit plans, brightline rules are advantageous to beneficiaries and fiduciaries alike, providing assured protection to the former and clear notice of responsibility to the latter. [716 F.2d at 1464-1465. Citations omitted.]

After a review of the statutory framework and legislative history of section 4975 and the case law interpreting ERISA section 406, we conclude that the prohibited transactions contained in section 4975(c)(1) are just that. The fact that the transaction would qualify as a prudent investment when judged under the highest fiduciary standards is of no consequence. Furthermore, the fact that the plan benefits from the transaction is irrelevant. Good intentions and a pure heart are no defense. Therefore, petitioner is clearly liable for the tax imposed by section 4975(a) for the taxable year 1980, the year in which the prohibited transaction occurred.

Petitioner, next contends that the prohibited transaction did not extend beyond December 31, 1980, and, therefore, he is not liable for the tax imposed by section 4975(a) for the taxable year 1981. The tax on a prohibited transaction is imposed for each year (or part thereof) in the taxable period. Sec. 4975(a). The taxable period is "the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of—(A) the date of mailing a notice of deficiency with respect to the tax imposed by subsection (a) under section 6212, (B) the date on which the tax imposed by subsection (a) is assessed, or (C) the date on which correction of the prohibited transaction is completed." Sec. 4975(f)(2). The correction of a prohibited transaction requires "undoing the transaction to the extent

possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards." Sec. 4975(f)(5).

Section 141.4975-13, Temporary Excise Tax Regs., 51 Fed. Reg. 16300 (May 2, 1986), provides that until "superseded by permanent regulations under section 4975(f)(4) and (5), section 53.4941(e)-1 of this chapter (Foundation Excise Tax Regulations) will be controlling to the extent such regulations describe terms appearing both in section 4941(e) and section 4975(f)."[11] Section 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., provides that in the case of the "sale of property to a private foundation by a disqualified person for cash, undoing the transaction includes, but is not limited to, requiring rescission of the sale where possible."[12] However, if "prior to the end of the correction period, the foundation resells the property in an arm's-length transaction to a bona fide purchaser who is not a disqualified person, no rescission is required." Sec. 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs.[13]

Petitioner challenges the validity of the portion of section 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs., quoted above for two reasons. Petitioner also implicitly challenges the validity of the portion of section 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., quoted above for the same reasons. Petitioner contends that if the property involved is publicly traded stock, it can be disposed of at any time, and the trust and its beneficiaries are adequately protected; therefore, correction of the prohibited transaction is unnec-

---

[11]See sec. 4941(e)(3).

[12]Sec. 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., also provides that in order to avoid placing the private foundation in a position worse than that in which it would be if rescission were not required, the amount received from the disqualified person pursuant to the rescission shall be the greatest of the cash paid to the disqualified person, the fair market value of the property at the time of the original sale, or the fair market value of the property at the time of rescission. In addition to rescission, the disqualified person is required to pay over to the private foundation any net profits he realized after the original sale with respect to the consideration he received from the sale.

[13]Sec. 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs., also provides that the disqualified person must pay over to the private foundation the excess (if any) of the amount which would have been received from the disqualified person pursuant to sec. 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs. (see note 12 supra), if rescission had been required over the amount realized by the private foundation upon resale of the property. In addition, the disqualified person is required to pay over to the private foundation any net profits he realized, as described in sec. 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs. (see note 12 supra).

essary. Petitioner also contends that rescission would not have been in the best interest of the trust or the beneficiaries as it would have deprived them of the gain which was assured upon the sale of the stock. Therefore, in keeping with the highest fiduciary standards, and in order to avoid placing the trust in a position worse than that in which it would have been if rescission were required, it was proper for the trust to hold the Cunningham stock in the name of petitioner as trustee until it was sold.

With respect to the first argument of petitioner, he basically contends that if a disqualified person sells marketable securities to a plan, the transaction does not have to be corrected in order to prevent the imposition of the tax under section 4975(a) for subsequent years because the stock can be disposed of at any time and the trust and its beneficiaries are adequately protected. As a result, although petitioner is liable for the tax for the year in which he sells the marketable securities to the trust, he would not be liable for the tax in subsequent years even though the trust retains the marketable securities. Such a rule would require us to graft an exception for marketable securities onto section 4975(f)(5). This we decline to do.

With respect to the second argument of petitioner, he would apply the highest fiduciary standards in determining whether to require correction of a prohibited transaction. Petitioner, in essence, argues that although the sale to the trust was a prohibited transaction, it does not have to be corrected in order to prevent the imposition of the tax under section 4975(a) for subsequent years, if under the highest fiduciary standards correction is not required.

We have rejected above the contention of petitioner that a prohibited transaction is acceptable if it would qualify as a prudent investment when judged under the highest fiduciary standards. Petitioner is merely delaying the application of the standard until after the prohibited transaction occurs. The net effect of his argument would be that a prohibited transaction is subsequently rendered acceptable if under the highest fiduciary standards it should not be corrected. As a result, although petitioner is liable for the tax for the year of the initial sale, he would not be liable for the tax in subsequent years if it is determined that the

transaction should not be corrected. This is inconsistent with the structure of section 4975 which prohibits certain transactions, regardless of how prudent the transaction or whether the plan benefited therefrom; and imposes a tax for each year until the prohibited transaction is corrected. The imposition of the highest fiduciary standards in determining whether to correct a prohibited transaction would place an unwarranted limitation upon the reach of section 4975(a). The highest fiduciary standards mentioned in section 4975(f)(5) apply to the conduct of the disqualified person in undoing the prohibited transaction (see notes 12 & 13), not in determining whether to correct it.

In determining the propriety of the challenged portions of the regulation, we begin with the general proposition that the Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a). We ordinarily defer to the Commissioner's interpretive regulations because "Congress has delegated to the Commissioner, not to the courts, the task of prescribing" such regulations. *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979). It is well settled that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969). The Supreme Court has repeatedly declared, in strong and unequivocal terms, that Treasury regulations should not be struck down lightly. E.g., *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981). In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982); *National Muffler Dealers Association, Inc. v. United States*, *supra* at 477.

Section 4975(f)(5) provides that the correction of a prohibited transaction requires undoing the transaction to the extent possible. Section 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., provides that in the case of the sale of property to a private foundation by a disqualified person for cash, undoing the transaction includes, but is not limited to, requiring rescission of the sale where possible. This is a

reasonable interpretation and is consonant with the plain language of section 4975(f)(5). Section 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs., provides that rescission is not required if, prior to the end of the correction period, the private foundation resells the property in an arm's-length transaction to a bona fide purchaser who is not a disqualified person. This portion of the regulation merely provides a practical exception to the general rule of rescission because if the trust resells the property, the original sale cannot be rescinded. This fully comports with the "to the extent possible" language of the statute. The challenged portions of the regulation, therefore, harmonize with the plain language of section 4975(f)(5).

To ascertain legislative concerns and policies in enacting ERISA, it is not necessary to delve deeply into committee hearings and reports. In section 2 of ERISA, Congress stated its findings and policy:

(a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; * * * that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; * * * that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

(b) It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

[ERISA sec. 2, 88 Stat. 832.]

We have stated above that in enacting section 4975(c)(1), Congress intended to create a blanket prohibition against certain transactions, regardless of how prudent the transaction or whether the plan benefited therefrom, unless either the transaction came within a statutory exemption or an

administrative exemption had been granted. If a prohibited transaction is entered into, section 4975(a) imposes an excise tax for each year until the transaction is corrected. The challenged portions of the regulation establish the conduct required in order to correct a prohibited transaction; thereby, preventing the imposition of the tax for subsequent years. Section 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., provides that as a general rule, rescission is required where possible and section 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs., merely provides a practical exception to the general rule. We hold, therefore, that the challenged portions of section 53.4941(e)-1(c)(3)(i) and (ii), Foundation Excise Tax Regs., are harmonious with the origin and purpose of the statute. Accordingly, the challenged portions of the regulation are valid.

It is evident that petitioner did not take any steps necessary to correct the prohibited transaction before 1981. The transaction was not rescinded and the stock was not sold to the New York investors until February 1981. Furthermore, petitioner did not pay to the trust the excess of the price at which he sold the stock to the trust over the price that the trust would have had to pay for the stock on the open market until December 1981. Accordingly, the only transactions that could constitute correction occurred after 1981 began. Petitioner is, therefore, also liable for the tax imposed by section 4975(a) for the taxable year 1981.

Petitioner next contends that the amount of the tax is incorrect because it was not computed based upon the fair market value of the consideration received by him from the trust and because the computation did not take into account the subsequent repayment by him of a portion of the sales price.

The tax imposed is equal to 5 percent of the amount involved with respect to a prohibited transaction. Sec. 4975(a). The "amount involved" is defined, with certain exceptions which are not applicable here, as the greater of the amount of money and the fair market value of the other property either given or received. Sec. 4975(f)(4). The fair market value in the case of the tax imposed by subsection (a) shall be determined as of the date on which the prohibited transaction occurs. Sec. 4975(f)(4)(A).

Petitioner contends that the tax should be calculated based upon the sum of the cash received and the fair market value of the non-interest-bearing demand note. Petitioner contends that the fair market value of the note is to be determined by discounting it to its present value. Petitioner, however, overlooks the fact that the note was payable on demand. The note did not have a maturity date and consequently, there is no time period to be used in discounting the note. Immediately after issuance of the note, petitioner could have presented it for payment and would have been entitled to receive the face value. Further, petitioner was trustee of the obligor and testified that the trust had assets of approximately $700,000. So the risk of nonpayment on the note was negligible. Accordingly, we conclude that the fair market value of the note was equal to its face value as the evidence does not establish to our satisfaction that the note had any lesser value.

Petitioner also contends that his subsequent repayment of a portion of the sales price should reduce the amount involved. However, the amount involved in determining the tax under section 4975(a) is to be determined as of the date on which the prohibited transaction occurs. Sec. 4975(f)(4)(A). Therefore, subsequent repayments are not relevant for purposes of determining the amount involved under section 4975(a). Accordingly, petitioner is not entitled to reduce the amount involved by the subsequent repayment of a portion of the sales price.

In sum, we conclude that petitioner is liable for the excise tax imposed by section 4975(a) in the amount of $7,787.50 for each of the taxable years 1980 and 1981.

To reflect the foregoing,

*Decision will be entered for the respondent.*