T.C. Memo. 2013-245

UNITED STATES TAX COURT

TERRY L. ELLIS AND SHEILA K. ELLIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12960-11.                    Filed October 29, 2013.

Troy Renkenmeyer, for petitioners.

Elizabeth Abigail Raines, for respondent.

MEMORANDUM OPINION

PARIS, Judge:  On March 28, 2011, respondent issued a notice of

deficiency for tax years 2005 and 2006 to petitioners Terry L. Ellis and Sheila K.

Ellis, taking alternative positions for these two tax years.  The notice determined a

deficiency in petitioners' Federal income tax for tax year 2005 of $135,936 and an

[*2] accuracy-related penalty under section 6662(a)[1] of $27,187.  In the alternative, the notice determined a deficiency in petitioners' Federal income tax for tax year 2006 of $133,067, an addition to tax under section 6651(a)(1) of $19,731, and an accuracy-related penalty under section 6662(a) of $26,613.

Petitioners seek redetermination of the above-stated deficiencies, penalties, and additions to tax.  The issues for decision are:

(1) whether petitioner Terry L. Ellis participated in one or more prohibited transactions under section 4975 with his individual retirement account (IRA) in 2005 when he directed his IRA to invest in CST Investments, LLC (CST), pursuant to an arrangement or understanding whereby he was designated the general manager and would subsequently receive compensation and other benefits from that company;

(2) whether Mr. Ellis participated in one or more prohibited transactions under section 4975 when he caused CST to pay him compensation of $9,754 in tax year 2005;

---

[1]All section references are to the Internal Revenue Code in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*3]**   (3) whether Mr. Ellis participated in one or more prohibited transactions under section 4975 when he caused CST to pay him compensation of $29,263 in tax year 2006;

(4) whether Mr. Ellis participated in one or more prohibited transactions under section 4975 when he caused CST to pay rent to CDJ, LLC, an entity owned by petitioners and their children, in tax year 2006;

(5) whether petitioners received unreported retirement income as a result of Mr. Ellis' participation in a prohibited transaction under section 4975 with his IRA in 2005, or, in the alternative, 2006;

(6) whether petitioners are liable for the 10% additional tax under section 72(t) for tax year 2005, or, in the alternative, 2006;

(7) whether petitioners are liable for the accuracy-related penalty under section 6662(a) for tax year 2005, or, in the alternative, 2006; and

(8) whether petitioners are liable for an addition to tax under section 6651(a)(1) for tax year 2006.

## Background

The parties submitted this case for decision fully stipulated under Rule 122(a).  The stipulation of facts filed on June 12, 2012, is incorporated herein by this reference.  Petitioners resided in Missouri at the time their petition was filed.

**[*4]** I. <u>Tax Year 2005</u>

    A. <u>Formation of CST</u>

By 2005 petitioner Terry L. Ellis had accumulated a sizable amount in his section 401(k) retirement plan account from his many years of service as an employee at Aventis Pharmaceuticals, Inc. On or about April 19, 2005, Mr. Ellis engaged the former law firm of petitioners' current counsel of record in this case to advise him regarding the restructuring of his investment holdings. On May 25, 2005, the firm helped petitioners to organize CST, a Missouri limited liability company.[2] The operating agreement of CST, also dated May 25, 2005, was signed by Mr. Ellis on behalf of First Trust Co. of Onaga FBO Terry Ellis IRA, an entity that did not yet exist. The agreement listed the original members of CST to be First Trust Co. of Onaga FBO Terry Ellis IRA, owning 980,000 membership units or 98% in exchange for an initial capital contribution of $319,500, and a member not a party to this action owning the remaining 20,000 membership units or 2%. Mr. Ellis also requested a Federal taxpayer identification number for CST on a Form SS-4, Application for Employer Identification Number, which was dated

---

[2]Despite its name, CST Investments, LLC is not a registered investment company under the Investment Company Act of 1940.

**[*5]** May 16, 2005.  On June 2, 2005, a Federal tax identification number was assigned to CST.

CST was formed to engage in the business of used vehicle sales.  It conducted its operations in Harrisonville, Missouri.  At all relevant times during tax years 2005 and 2006, Mr. Ellis was the general manager of CST and, in addition, worked at the company in its used car business.[3]

On or about June 7, 2005, Mr. Ellis submitted an application to establish an IRA with First Trust Co. of Onaga (First Trust).  On or about June 14, 2005, Mr. Ellis, as general manager of CST, filed a Form 8832, Entity Classification Election, on behalf of CST, in which it elected to be treated as an association taxable as a corporation.[4]

On or about June 22, 2005, Mr. Ellis received a distribution of $254,206.44 from the section 401(k) account he had accumulated with his former employer,

---

[3]Mr. Ellis was the designated general manager in the operating agreement for CST.  Article II of the operating agreement further stated:  "The General Manager shall have full authority to act on behalf of the Limited Liability Company".  See also Mo. Rev. Stat. secs. 347.065, 347.069 (2012).

[4]Mo. Rev. Stat. sec. 347.187.2 (2012) provides that a Missouri limited liability company and its members shall be classified and treated on a basis consistent with the limited liability company's classification for Federal income tax purposes.

[*6] Aventis Pharmaceuticals.[5] Mr. Ellis took the distribution check from his section 401(k) account and deposited the entire $254,206.44 into his newly opened IRA.[6] On or about June 23, 2005, Mr. Ellis caused his IRA to acquire 779,141 membership units of CST in exchange for a cash payment of $254,000 from the IRA to CST.[7]

On or about August 19, 2005, Mr. Ellis received a second distribution of $67,138.81 from the section 401(k) account he had accumulated at Aventis Pharmaceuticals.[8][9] As with the first distribution check, Mr. Ellis deposited the entire $67,138.81 into his IRA. On or about August 23, 2005, Mr. Ellis caused his IRA to acquire 200,859 membership units of CST, in exchange for a payment of

---

[5]The distributor, T. Rowe Price, issued to petitioners a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRA's, Insurance Contracts, etc., for tax year 2005 to report the $254,206.44 distribution.

[6]This transaction was reported as a rollover contribution by T. Rowe Price.

[7]After this payment to CST and applicable fees, $191 in cash remained in the IRA account.

[8]The distributor, T. Rowe Price, issued to petitioners a second Form 1099-R for 2005 to report the $67,138.81 distribution.

[9]The record also reflects that, at some point during tax year 2005, Mr. Ellis received a third distribution of $21 from the sec. 401(k) account he had accumulated with Aventis Pharmaceuticals. This distribution was also reported by T. Rowe Price on a Form 1099-R for tax year 2005.

[*7] $65,500 from the IRA to CST.[10]  Following the completion of the $319,500

capital contribution, a single membership certificate for 980,000 units was issued

to First Trust FBO Terry Ellis IRA on June 23, 2005.

On or about November 28, 2005, First Trust, the custodian of Mr. Ellis'

IRA, requested a current estimate of the fair market value of the IRA's

membership interest in CST.  On December 20, 2005, Mr. Ellis provided a current

valuation of CST to the IRA custodian.  Subsequently, on or about June 20, 2006,

First Trust issued to Mr. Ellis and to respondent a Form 5498, IRA Contribution

Information, for tax year 2005 reflecting a fair market value of the IRA account of

$321,253.  This amount consisted of $319,480 of value in the 98% interest in CST

and the remaining cash balance of $1,773.[11]

During tax year 2005 CST paid Mr. Ellis $9,754 as compensation for his

role as general manager of CST.  CST made these payments through checks issued

from its corporate checking account, and not from the custodial account of Mr.

Ellis' IRA.  On or before March 15, 2006, CST filed a Form 1120, U.S.

Corporation Income Tax Return, for tax year 2005.  CST claimed a deduction from

---

[10]After this payment to CST and applicable fees, $1,794 in cash remained in the IRA account.

[11]The cash balance was reduced by approximately $21 in custodial fees between August 23 and December 20, 2005.

[*8] corporate income for compensation paid to corporate officers, which consisted only of the $9,754 paid to Mr. Ellis.[12] In addition to what appears to be normal operating expenses, CST also listed additional deductions of $12,106 for payroll expenses, $5,462 for bank service charges, and $8,910 for legal fees.[13]

B. Formation of CDJ, LLC

On or about June 24, 2005, petitioners' counsel's former firm also organized CDJ, LLC (CDJ), a Missouri limited liability company, on behalf of Mr. Ellis. From that point to the date the parties executed the stipulation of facts, the members of CDJ were Terry L. Ellis (50%), Sheila Ellis (12.5%), and their three children: Christopher Ellis (12.5%), Douglas Ellis (12.5%), and Jamie Ellis (12.5%). CDJ did not file a Form 8832 and did not otherwise elect to be classified as an association taxable as a corporation.

---

[12]This amount was reported on a Form W-2, Wage and Tax Statement, issued to Mr. Ellis for tax year 2005 and subsequently reported by petitioners on their 2005 Federal income tax return as wages. As discussed below, the original operating agreement of CST authorized Mr. Ellis to be paid guaranteed payments by the company in his role as general manager. It is unclear whether this amount paid as "officer compensation" was issued under the guaranteed payment provision of the operating agreement or was issued as wages to Mr. Ellis.

[13]The original engagement letter with petitioners' counsel's firm listed a legal fee of "3% of the amount accessed from deferred compensation accounts * * * payable upon the investment by your IRA into the corporation."

[*9]   The purpose of CDJ was to acquire investment property and to rent such property through the issuance of commercial leases.  On December 28, 2005, CDJ acquired title to a parcel of real property at 23621 S. State Route 291, Harrisonville, Missouri (Harrisonville parcel).  The purchase price for the Harrisonville parcel was $142,000.  CDJ paid $12,000 down and obtained a mortgage for the balance of $130,000 from the Bank of Lee's Summit.

On or before April 15, 2006, a Form 1065, U.S. Return of Partnership Income, was filed on behalf of CDJ for tax year 2005.  This return reported neither gross income nor receipts but did report expense deductions of $3,598, resulting in a reported net loss of $3,598.

C.  Petitioners' 2005 Return

On or about May 6, 2006, petitioners filed their joint Federal income tax return for tax year 2005.  Petitioners reported total income of $75,270, consisting of wages of $76,046,[14] taxable refunds of State and local income taxes of $1,473, and a loss on Schedule E, Supplemental Income and Loss, from CDJ of $2,249.[15]

---

[14]Petitioners reported that Mr. Ellis had wage income from Aventis Pharmaceuticals of $25,713 and CST of $9,754, while Mrs. Ellis had wage income from an unrelated employer in the amount of $40,579.

[15]This loss consisted of the $1,799 allocable to Mr. Ellis and the $450 allocable to Mrs. Ellis out of CDJ's net loss of $3,598 for tax year 2005.

(continued...)

[*10] On the return, petitioners also reported pension distributions of $321,266 but did not report any portion of these distributions as taxable. Accordingly, petitioners reported their gross income as $77,519 for tax year 2005. Petitioners did not report that Mr. Ellis' IRA purchased a total of 980,000 membership units of CST in tax year 2005. Petitioners likewise did not disclose that CST, an entity that had paid compensation to Mr. Ellis in 2005, was thus owned primarily by his IRA.

## II. Tax Year 2006

### A. CST and CDJ Operations

On January 1, 2006, CST entered into an agreement to lease the Harrisonville parcel from CDJ from January 1, 2006, to January 1, 2016. CST used this real estate to operate its used car business. Throughout tax year 2006 CST made monthly rent payments to CDJ for use of the Harrisonville parcel as it operated its used car business. These rent payments totaled $21,800 for tax year 2006.

Also during tax year 2006 CST paid $29,263 of compensation to Mr. Ellis for his role as general manager of CST in operation of its used car business. Both

---

[15](...continued)
Petitioners' Schedule A, Itemized Deductions, did not reflect any legal fees as an expense paid for the production of income.

[*11] the rent payments to CDJ and the compensation payments to Mr. Ellis were made from CST's corporate checking account and not from the custodial account of Mr. Ellis' IRA.

On or before July 6, 2007, CST filed its corporate income tax return for tax year 2006. On this return CST claimed a deduction from corporate income for compensation paid to corporate officers, consisting only of the $29,263 paid to Mr. Ellis. On or before the same date, a partnership information return was filed on behalf of CDJ for tax year 2006. The first page of this return reported zero income and claimed zero deductions. However, the form later reported net rental income from real estate of $830, subject to the following allocation to the members of CDJ: $414 to Terry Ellis, $104 to Sheila Ellis, and $104 each to petitioners' three children, Christopher, Douglas, and Jamie.

B. Petitioners' 2006 Return

On or about July 6, 2007, petitioners filed their joint Federal income tax return for tax year 2006. Petitioners did not, before April 15, 2007, file a request for extension of time to file. Petitioners reported their total income to be $72,705 for tax year 2006. Petitioners reported that Mr. Ellis had wage income from CST of $29,263, while Mrs. Ellis had wage income from an unrelated employer of $41,967. Petitioners also reported that they had taxable refunds of State and local

[*12] income taxes of $863, pension income to Mr. Ellis from T. Rowe Price of

$93,[16] and Schedule E income from CDJ of $519.[17]

Petitioners did not report any pension income other than the $93 from T. Rowe Price. Petitioners again did not disclose that CST, an entity that had paid compensation to Mr. Ellis in 2005, was owned primarily by his IRA.

## III. The Notice of Deficiency

On March 28, 2011, respondent issued to petitioners a notice of deficiency for tax years 2005 and 2006. This notice reflected respondent's determination of a deficiency in income tax of $135,936 for tax year 2005, or, in the alternative, a deficiency in income tax of $133,067 for tax year 2006. The notice further reflected respondent's determination to impose on petitioners an accuracy-related penalty under section 6662(a) of $27,187 for tax year 2005, or, in the alternative, $26,613 for tax year 2006. The notice also reflected respondent's determination of

---

[16]Petitioners also reported their liability for an early distribution tax under sec. 72(t) of $9 (10% of $93).

[17]This income consisted of the $415 allocable to Mr. Ellis and the $104 allocable to Mrs. Ellis out of CDJ's net income of $830 for tax year 2005.

[*13] an addition to tax for failure to timely file a return under section 6651(a)(1) of $19,731 for tax year 2006.[18]

Respondent's determinations in the notice of deficiency were based on the premise that at one of a few alternative points during tax years 2005 and 2006, Mr. Ellis engaged in a prohibited transaction under section 4975 with his IRA. Respondent further determined that as of the first day of the taxable year in which the prohibited transaction occurred, Mr. Ellis' IRA ceased to be an "eligible retirement plan" under section 402 and the fair market value of the IRA was deemed distributed to him on the first day of that taxable year under section 408.

Respondent determined that a prohibited transaction under section 4975 occurred at one of the following points: (1) when Mr. Ellis caused his IRA to engage in the sale and exchange of membership interests in CST in tax year 2005; (2) when Mr. Ellis caused CST, an entity owned by his IRA, to pay him compensation in tax year 2005; (3) when Mr. Ellis caused CST, an entity owned by his IRA, to pay him compensation in tax year 2006; or (4) when Mr. Ellis

---

[18]Petitioners' return as originally filed reflected an overpayment of $1,527 for tax year 2006. Respondent has asserted that petitioners will be liable for the addition to tax under sec. 6651(a)(1) only to the extent the Court determines a deficiency for tax year 2006.

**[*14]** caused CST, an entity owned by his IRA, to enter into a lease agreement with CDJ, an entity owned by both petitioners and their children in tax year 2006.

The notice of deficiency also reflected respondent's determination that, for the year in which the prohibited transaction occurred petitioners are liable for the additional tax under section 72(t) for early distributions from a qualified retirement plan.

On June 1, 2011, petitioners filed a petition in this Court for review of respondent's determinations with respect to tax years 2005 and 2006.

## Discussion

I. Section 4975

A. Introduction

Section 4975 sets forth certain prohibited transactions with respect to a qualified retirement plan, including an IRA described in section 408(a). Section 4975(c) defines these prohibited transactions as any direct or indirect: (1) sale or exchange, or leasing, of any property between a plan and a disqualified person; (2) lending of money or other extension of credit between a plan and a disqualified person; (3) furnishing of goods, services, or facilities between a plan and a disqualified person; (4) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan; (5) act by a disqualified person who is a

**[\*15]** fiduciary whereby he deals with the income or assets of a plan in his own interests or for his own account; or (6) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan. These enumerated prohibited transactions are not mutually exclusive; one transaction may fall within the parameters of more than one of the identified transactions under section 4975. Janpol v. Commissioner, 101 T.C. 518, 525 (1993).

The purpose of section 4975, in part, is to prevent taxpayers involved in a qualified retirement plan from using the plan to engage in transactions for their own account that could place plan assets and income at risk of loss before retirement. See generally sec. 4975; S. Rept. No. 93-383 (1974),1974-3 C.B. (Supp.) 80; H.R. Rept. No. 93-807 (1974), 1974-3 C.B. (Supp.) 236. The enumerated transactions set forth in section 4975 are meant to exhibit per se examples of this kind of self-dealing, and participation in such prohibited transactions is just that -- prohibited. See Leib v. Commissioner, 88 T.C. 1474, 1481 (1987). The fact that a transaction would qualify as a prudent investment when judged under the highest fiduciary standards is of no consequence. Id.

**[\*16]** B. <u>Fiduciary and Disqualified Person Status</u>

For the purposes of section 4975, a fiduciary is defined as any person who: (1) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (2) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or (3) has any discretionary authority or discretionary responsibility in the administration of such plan. Sec. 4975(e)(3). Further, a fiduciary with respect to a qualified retirement plan is also a disqualified person for the purposes of section 4975. Sec. 4975(e)(2)(A).

Mr. Ellis certainly exercised discretionary authority over his IRA and likewise exercised control over the disposition of its assets. Mr. Ellis seeded his plan in June of 2005 with the proceeds from his section 401(k) plan account with his former employer. Mr. Ellis then exerted control over his IRA in causing it to engage in the purchase of membership units of CST. Accordingly, Mr. Ellis was a fiduciary of his IRA within the meaning of section 4975 and consequently a disqualified person with respect to that plan.

**[*17]** C. <u>Formation of CST</u>

As previously stated, section 4975 prohibits any direct or indirect sale or exchange of any property between a plan and a disqualified person. Sec. 4975(c)(1)(A). In addition to a fiduciary as defined above, the term "disqualified person" under section 4975(e)(2) also includes a corporation or a partnership of which 50% or more of (1) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation, or (2) the capital interest or profits interest of a partnership, is owned directly or indirectly or held by a fiduciary as described in section 4975(e)(2)(A). Sec. 4975(e)(2)(G). Section 4975(e)(4) incorporates the constructive ownership rule of section 267(c)(1), which provides that "[s]tock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries".

Petitioners argue that Mr. Ellis did not engage in a prohibited transaction by causing his IRA to invest in CST. Petitioners rely on <u>Swanson v. Commissioner</u>, 106 T.C. 76, 88 (1996), to show that CST was not a disqualified person at the time the investment was made. In <u>Swanson</u>, the taxpayer organized a domestic

[*18] international sales corporation[19] known as Swanson's Worldwide, Inc. (Worldwide).  The taxpayer then established an IRA at Florida National Bank and subsequently executed a subscription agreement for the exchange of IRA funds for 2,500 shares of Worldwide original issue stock.  The Court stated that a "corporation without shares or shareholders does not fit within the definition of a disqualified person under section 4975(e)(2)(G)."  Id.  The Court concluded that it was only after Worldwide issued its stock to the taxpayer's IRA that Worldwide had become a disqualified person under section 4975(e)(2)(G).

The Court finds in this context that an LLC that elects to be treated as a corporation and does not yet have members or membership interests is sufficiently analogous to a "corporation without shares or shareholders".  Mr. Ellis organized CST without taking any ownership interest in the company.[20]  In the original operating agreement, dated May 25, 2005, Mr. Ellis' IRA is shown as an investing member with a 98% ownership interest in CST in exchange for an initial capital contribution of $319,500.  Mr. Ellis' IRA was subsequently created on June 7,

---

[19]Domestic international sales corporation is commonly referred to as "DISC".

[20]Under Mo. Rev. Stat. sec. 347.037 (2012), "[a]ny person, whether or not a member or manager, may form a limited liability company by signing and filing articles of incorporation for such limited liability company with the secretary."

**[*19]** 2005, and the initial capital contribution was effected through the transfer of funds to CST in payments of $254,000 and $65,500 on June 23 and August 23, 2005, respectively. The end result of this transaction was the creation of a new entity, CST, with Mr. Ellis' IRA as a founding member with a 98% ownership interest. CST had no outstanding owners or ownership interests before the initial capital contribution and therefore could not be a disqualified person at the time of the investment by Mr. Ellis' IRA. Accordingly, petitioners did not engage in a prohibited transaction when they caused Mr. Ellis' IRA to invest in CST.[21]

D. Compensation paid by CST to Mr. Ellis

The direct or indirect transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan is a prohibited transaction under section 4975(c)(1)(D). Similarly, an act by a disqualified person who is a fiduciary whereby he directly or indirectly deals with the income or assets of a plan in his own interest or for his own account is a prohibited transaction under section 4975(c)(1)(E).

---

[21]Respondent has also argued that Mr. Ellis engaged in a prohibited transaction when he caused his IRA to invest in CST because the investment was made as part of an arrangement whereby it was expected that a prohibited transaction would later occur under sec. 4975(c)(1)(D) or (E). In light of the following analysis, the Court finds it unnecessary to address these arguments at this time.

**[\*20]** As detailed above, Mr. Ellis was a fiduciary of his IRA and therefore a disqualified person. In addition, Mr. Ellis was the sole individual for whose benefit the IRA was established and therefore the beneficial owner of 98% of the outstanding membership interests of CST. See secs. 4975(e)(4), 267(c)(1). Because Mr. Ellis, a fiduciary of his IRA, was the beneficial shareholder of more than 50% of the outstanding ownership interest in CST, CST met the definition of a disqualified person under section 4975(e)(2)(G). See Swanson v. Commissioner, 106 T.C. at 88 n.15.

During tax year 2005 CST paid $9,754 to Mr. Ellis. On CST's corporate income tax return for tax year 2005, this amount is reflected as officer compensation. Section 2.3 of the operating agreement for CST states that "the General Manager shall be entitled to such Guaranteed Payment as is approved by the members." It is unclear whether Mr. Ellis was issued compensation under this guaranteed payment provision or as wages. However, as the fiduciary of his IRA-- a member of CST with 98% of the outstanding ownership interest--and the general manager of CST, Mr. Ellis ultimately had discretionary authority to determine the amount of his compensation and effect its issuance in either circumstance.

Petitioners argue that Mr. Ellis did not engage in a prohibited transaction when he caused CST to pay him compensation because the amounts it paid to him

[*21] did not consist of plan income or assets of his IRA but merely the income or assets of a company in which his IRA had invested. However, CST was funded almost exclusively by the assets of Mr. Ellis' IRA. Furthermore, the assets of Mr. Ellis' IRA consisted only of its ownership interest in CST, valued at $319,480, and $1,773 in cash. To say that CST was merely a company in which Mr. Ellis' IRA invested is a complete mischaracterization when in reality CST and Mr. Ellis' IRA were substantially the same entity. In causing CST to pay him compensation, Mr. Ellis engaged in the transfer of plan income or assets for his own benefit in violation of section 4975(c)(1)(D). Furthermore, in authorizing and effecting this transfer, Mr. Ellis dealt with the income or assets of his IRA for his own interest or for his own account in violation of section 4975(c)(1)(E).

Petitioners also argue that section 4975(d)(10) exempts the payment of compensation by CST to Mr. Ellis in tax year 2005 from being classified as a prohibited transaction. That section provides that the prohibited transactions set forth under section 4975(c) shall not apply to receipt by a disqualified person of any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan. However, the amounts CST paid as compensation to Mr. Ellis were not for services provided in the administration of a qualified retirement plan in managing

[*22] its investments, but rather for his role as general manager of CST in connection with its used car business. Accordingly, section 4975(d)(10) does not apply. See Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1216 (2d Cir. 1987) (finding that section 408(c)(2) of the Employee Retirement Income Security Act of 1974 (ERISA), the parallel provision to section 4975(d)(10), exempts the fees and compensation paid pursuant to a plan's investment management agreement, but not other compensation from companies in which the plan is invested).[22]

In essence, Mr. Ellis formulated a plan in which he would use his retirement savings as startup capital for a used car business. Mr. Ellis would operate this business and use it as his primary source of income by paying himself compensation for his role in its day-to-day operation. Mr. Ellis effected this plan by establishing the used car business as an investment of his IRA, attempting to preserve the integrity of the IRA as a qualified retirement plan. However, this is precisely the kind of self-dealing that section 4975 was enacted to prevent. For

---

[22]The Court has previously found that to the maximum extent possible the prohibited transaction rules are identical in the labor and tax provisions, so they will apply in the same manner to the same transaction. Thus, the caselaw interpreting ERISA is instructive with regard to interpreting the prohibitive transactions under sec. 4975. See Leib v. Commissioner, 88 T.C. 1474, 1480-1481 (1987).

[*23] the foregoing reasons, the Court sustains respondent's determination that Mr. Ellis engaged in  prohibited transactions under section 4975(c)(1)(D) and (E) when he caused CST to pay him compensation of $9,754 in tax year 2005.[23] [24]

II.  Effect of the Prohibited Transaction

   A.  Inclusion in Gross Income

If, during any taxable year of an individual for whose benefit any IRA is established, that individual or his beneficiary engages in a prohibited transaction under section 4975, the account will cease to be an IRA as of the first day of the taxable year.  Sec. 408(e)(2)(A).  In such a case, the IRA in question will no longer be exempt from tax under section 408(e)(1).  Further, where such an account ceases to be an IRA by reason of section 408(e)(2)(A), the account is deemed to have been distributed on the first day of the taxable year in an amount equal to the fair market value of all the assets of the account on that first day.  Sec. 408(e)(2)(B); sec. 1.408-4(d)(1), Income Tax Regs.

---

[23]Since the Court has determined that a prohibited transaction occurred in tax year 2005, it is unnecessary to consider whether any later transactions engaged in by petitioners were prohibited under sec. 4975.

[24]Unlike this case, the Court in Peek v. Commissioner, 140 T.C. __, __ (slip op. at 3 n.2) (May 9, 2013), concluded it did not need to reach the additional question of whether prohibited transactions occurred under secs. 4975(c)(1)(D) and (E) when the company made payments of wages to the taxpayers.

[*24] Section 61(a) defines gross income as all income from whatever source derived, including (but not limited to) annuities and pensions. See sec. 61(a)(9), (11). Section 408(d)(1) provides: "Except as otherwise provided in this subsection, any amount paid or distributed out of an individual retirement plan shall be included in gross income by the payee or distributee, as the case may be, in the manner provided under section 72." See Arnold v. Commissioner, 111 T.C. 250, 253 (1998); sec. 1.408-4(a), Income Tax Regs.

As detailed above, petitioners engaged in a prohibited transaction under section 4975 in tax year 2005. Accordingly, the entire amount of $321,366.25 converted from Mr. Ellis' section 401(k) plan account is deemed distributed on January 1, 2005, under section 408(e)(2)(A). That amount is therefore includible in petitioners' gross income for tax year 2005 under sections 408(d)(1) and 72(a). Because respondent determined alternative deficiencies for tax years 2005 and 2006, petitioners are therefore not liable for respondent's determinations with respect to tax year 2006.[25]

---

[25]This includes the entire deficiency as well as the associated addition to tax under sec. 6651(a)(1) and the accuracy-related penalty under sec. 6662(a).

[*25] B. Section 72(t)

Section 72(t) provides for a 10% additional tax on early distributions from qualified retirement plans unless the distribution falls within a statutory exemption. The most common of these exemptions include distributions that are made on or after the date on which the taxpayer attains age 59½ and distributions that are attributable to the taxpayer's being disabled. Sec. 72(t).

The parties have stipulated that Mr. Ellis had not attained the age of 59½ by January 1, 2005. Petitioners allege no other exemption under which they would escape the additional tax imposed by section 72(t). Accordingly, petitioners are liable for the 10% additional tax on the $321,366.25 deemed distribution for tax year 2005.

III. Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of an underpayment attributable to any substantial understatement of income tax or to negligence or disregard of rules or regulations. Under section 7491(c), the Commissioner has the burden of production to show that the imposition of a penalty under section 6662(a) is appropriate.

Section 6662(d) defines a "substantial understatement of income tax" as an understatement that exceeds the greater of: (1) 10% of the amount of tax required

[*26] to be shown on the return, or (2) $5,000. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c).

On their 2005 tax return petitioners reported total income tax due of $4,986. Respondent has demonstrated that the amount of tax required to be shown on petitioners' 2005 return was $140,922.[26] Petitioners' understatement of $135,936 is therefore greater than 10% of the tax required to be shown on the return, which is greater than $5,000. Accordingly, respondent has met his burden of production under section 7491(c).

No penalty will be imposed under section 6662(a) if the taxpayer establishes that he acted with reasonable cause and in good faith. Sec. 6664(c)(1). Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional or an honest misunderstanding of the law that is reasonable in light of all the facts and circumstances. Sec. 1.6664-4(b), Income Tax Regs. The taxpayer has the burden of proving that he acted with reasonable cause and in good faith. Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Regulations promulgated under section 6664(c) further provide

---

[26]This amount includes the additional tax of $32,137 under sec. 72(t).

[*27] that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs.

The parties have agreed in the stipulation of settled issues filed on June 12, 2012, that petitioners have not provided sufficient evidence and have not otherwise proven reasonable cause for relief from the penalty determined under section 6662(a). Accordingly, petitioners are liable for the section 6662(a) accuracy-related penalty for tax year 2005.

All other adjustments for tax year 2005 reflected on petitioners' notice of deficiency are computational. The Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate decision will be entered</u>.