**IN RE: Donald Keith ROGERS, Debtor.**

**RES–GA Dawson, LLC, and Bradley J. Patten, Chapter 7 Trustee, Movants,**

**v.**

**Donald Keith Rogers, Respondent.**

**Case No.: 13–22983–JRS**

United States Bankruptcy Court, N.D. Georgia, Gainesville Division.

Signed September 16, 2015

Filed September 17, 2015

Charles N. Kelley, Jr., Cummings & Kelley PC, Gainesville, GA, for Debtor.

CONTESTED MATTER

**ORDER**

James R. Sacca, U.S. Bankruptcy Court Judge

The Court must determine whether the Debtor, who is the sole trustee for and participant in a profit sharing plan, established and operated this alleged retirement plan in such a way that the Chapter 7 trustee is entitled to administer the assets in the plan for the benefit of creditors. The assets in the plan are estimated to be about $300,000 of cash, personal property and loans.

After Mr. Rogers filed for bankruptcy, a judgment creditor and the Chapter 7 trustee both filed motions to disallow an exemption he claimed in his profit sharing plan. The judgment creditor filed a motion for summary judgment to which Mr. Rogers responded with his own motion for summary judgment. The issues presented are: (1) whether the profit sharing plan is property of the bankruptcy estate and (2) if it is property of the estate, whether Mr. Rogers may exempt the plan under either Georgia law or the Bankruptcy Code. The crux of both issues is whether the plan is "qualified" under 26 U.S.C. § 401. If the plan is a qualified plan, it is either one of the following: (a) not property of the estate or (b) property of the estate which Mr. Rogers could exempt, either of which would render it not subject to administration or claims of creditors. On the other hand, if it is not a qualified plan, then it is property of the estate which Mr. Rogers may not exempt and which the Chapter 7 trustee may administer.

**Factual Background**

Sometime in 2000 or 2001, Donald Rogers ("Mr.Rogers") formed ProStar Properties, Inc. ("ProStar Properties"), which was in the business of building houses. (RES–GA's Statement of Material Facts Not in Dispute ("RES–GA's SOMF") ¶¶ 2; Mr. Rogers Response to RES–GA's Statement of Material Facts Not in Dispute ("Rogers' Response") ¶ 2; Donald Keith Rogers' Aff. ¶ 2). In 2004, ProStar Properties adopted the ProStar Properties Profit Sharing Plan (the "Plan"). (RES–GA's SOMF ¶ 5; Rogers' Response ¶ 5). Mr. Rogers was an officer, the sole owner, and the sole employee of ProStar Properties, as well as the only trustee of the Plan. (RES–GA's SOMF 4, 7, 24; Rogers' Response ¶¶ 4, 7, 24). Mr. Rogers' discontinued his employment with ProStar Properties in 2008, and sometime between 2011 and 2013 ProStar Properties ceased operation. (Rogers' Aff. ¶ 3–4; RES–GA's SOMF ¶ 3; Rogers' Response ¶ 3). The Adoption Agreement and a Summary Plan Description (the "Plan Summary") are both before the Court, but the actual Plan document has not been presented. (See RES–GA's Mot. for Summ. J. Exs. B & C, Docs. 57–3 & 57–4).

RES–GA Dawson, LLC ("RES–GA") is a judgment creditor of Mr. Rogers. It asserts that the Plan is not qualified and points to various facts to support that position, a summary of which follow. RES–GA contends that in 2010 Mr. Rogers' step-daughter made an $11,000 contribution to the Plan. (RES–GA's SOMF ¶ 12). Mr. Rogers disputes this allegation, and it appears the parties disagree about whether the money was provided to the Plan as a contribution or a loan. (Rogers' Response ¶ 12). In 2010 or 2011, the Plan

purchased a property in Flowery Branch, Georgia (the "Flowery Branch Property"), after which Mr. Rogers remodeled it, moved into it, paid no rent, did not sign a lease, and sold it on behalf of the Plan in 2013 for a profit.[1] (RES–GA's SOMF ¶¶ 15–19; Rogers' Response 15–19; Rogers' Aff. 5–6). In 2012, Mr. Rogers began using the Plan's checking account to pay his living expenses because it was his only source of money from which he could continue to pay those expenses. (RES–GA's SOMF 13–14; Rogers' Response ¶¶ 13–14). Mr. Rogers claims that his use of the funds were actually distributions permitted by the Plan.[2] (Rogers' Reply Brief 3, Doc. 72). However, there is no evidence before the Court as to how the use of that money was treated both for tax purposes and by the Plan. In 2013, the Plan purchased a boat and accompanying trailer (the "Boat"). (RES–GA's SOMF ¶¶ 20–21; Rogers' Response ¶¶ 20–21). Mr. Rogers asserts the Plan purchased the Boat as an investment for $6,000 less than fair market value and immediately began offering it for sale. (Rogers' Aff. ¶ 7). Mr. Rogers personally used the Boat at least ten times on Lake Lanier.[3] (RES–GA's SOMF ¶ 22; Rogers' Response ¶ 22). RES–GA claims the Plan also loaned $130,000 to Smokehouse Properties, LLC, a company owned by a relative of Mr. Rogers. (RES–GA's Reply to Debtor's Response ("RES–GA's Second Reply") 7, Jan. 16, 2015, Doc. 74). In addition, both parties contend that at some point the Plan made at least one loan to Mr. Rogers, but the Court does not have any evidence of the details of any loans made by the Plan to Mr. Rogers or

when they occurred. (*See* RES–GA's Reply to Debtor's Response ("RES–GA's First Reply") 9 n.5, Nov. 28, 2014, Doc. 68; Rogers' Reply Brief 3–4, 11, Doc. 72).

Mr. Rogers filed for chapter 7 bankruptcy relief on October 23, 2013. On his Schedule B, he listed his interest in the Plan and valued it at $300,000. In addition, on his Schedule C, he claimed the full fair market value of the Plan as exempt pursuant to O.C.G.A. § 44–13–100(a)(2.1). Subsequently, RES–GA and Bradley Patten, the Chapter 7 trustee (the "Trustee"), sought to disallow Mr. Rogers' exemption of the Plan. (Docs. 17 & 37). Mr. Rogers later amended his Schedule C to not only exempt the Plan under Georgia exemption law, but also pursuant to 11 U.S.C. § 522(b)(3)(C). (Doc. 61). Both RES–GA and the Trustee now seek to disallow the exemption under the Bankruptcy Code as well. (Docs. 67 & 69). After much discovery, Mr. Rogers and RES–GA have filed cross-motions for summary judgment which are presently before the Court (the "Motions"). The Court also heard oral argument on the Motions from counsel for Mr. Rogers, RES–GA, and the Trustee.

## Summary Judgment Standard

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor

---

**1.** Mr. Rogers sold the Flowery Branch Property on behalf of the Plan and the proceeds of the sale went back into the Plan's account.

**2.** The Plan Summary states that distributions are allowed upon termination of employment. (RES–GA's Mot. Ex. C., at 13, Doc. 57-4).

**3.** It appears that in early 2014 the Boat had not yet been sold, but it is unclear whether the Boat has since been sold.

of the non-moving party. *Id.* The Court "should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir. 1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, he must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of his claim on that legal issue. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). He must support his motion with credible evidence that would entitle him to a directed verdict if not controverted at trial. *Id.* "The movant 'always bears the initial responsibility of informing the ... court of the basis for its motion,' and identifying those portions of the record, including pleadings, discovery materials, and affidavits, 'which it believes demonstrate the absence of a genuine issue of material fact.' " *Smith v. Prine,* No., 2012 WL 2308639, at *1 (M.D.Ga. May 2, 2012) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party makes such a showing, he is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of material fact. *Id.*

**Discussion**

**A. Property of the Estate**

■ Upon the commencement of the case, § 541 creates a bankruptcy estate consisting of "all legal or equitable interests of the debtor in property." 11 U.S.C.

§ 541. However, pursuant to § 541(c)(2), "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in [a bankruptcy case]." 11 U.S.C. § 541(c)(2). To the extent the Plan has an anti-alienation provision that is enforceable under applicable nonbankruptcy law, the provision is enforceable in this case and the Plan will not become property of the estate. The burden of proof in establishing that something is not property of the bankruptcy estate pursuant to § 541(c)(2) rests on the debtor. *See e.g., In re Adams,* 302 B.R. 535, 540 (6th Cir. BAP 2003); *In re Greenly,* 481 B.R. 299, 307 (Bankr.E.D.Pa.2012); *In re Vanwart,* 497 B.R. 207, 211 (Bankr. E.D.N.C.2013).

In *Patterson v. Shumate,* the Supreme Court concluded that the applicable nonbankruptcy law referred to in § 541(c)(2) includes not only state law, but applicable nonbankruptcy federal law as 'well. *Patterson v. Shumate,* 504 U.S. 753, 757–59, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). In so concluding, the court held that an ERISA[4] qualified retirement plan was not property of the bankruptcy estate pursuant to § 541(c)(2). *Id.* at 759–60, 765, 112 S.Ct. 2242. Here, the parties agree that the Plan is not covered by ERISA because it only provides benefits to Mr. Rogers, the sole owner of the business, and thus ERISA is not the applicable nonbankruptcy law for purposes of § 541(c)(2). *See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon,* 541 U.S. 1, 21, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004) ("Plans that cover only sole owners or partners and their spouses, the regulation instructs, fall outside Title I's domain."); *Slamen v. Paul Revere Life Ins. Co.,* 166 F.3d 1102, 1104 (11th Cir.1999) ("Thus, in order to establish an ERISA employee

**4.** ERISA stands for the Employee Retirement Income Security Act.

welfare benefit plan, the plan must provide benefits to at least one employee, not including an employee who is also the owner of the business in question.").

■ The fact that the parties agree that this Plan is not ERISA qualified does not end the inquiry. A plan may still be a qualified plan other than under ERISA. Section 541(c)(2) excludes from property of the estate the beneficial interest of a debtor in a trust that is subject to a restriction on a transfer of that beneficial interest that is enforceable under "applicable nonbankruptcy law," which includes both state and federal law. Mr. Rogers asserts that such "applicable nonbankruptcy law" would include O.C.G.A. § 53–12–80(g) as explained by *In re Hipple*, 225 B.R. 808 (Bankr.N.D.Ga.1996).

Pursuant to O.C.G.A. § 53–12–80(g), "a spendthrift provision in a pension or retirement arrangement described in sections 401, 403, 404, 408, 408A, 409, 414, or 457 of the federal Internal Revenue Code ... shall be valid with reference to the entire interest of the beneficiary in the income, principal, or both, even if the beneficiary is also a contributor of trust property." In other words, if a retirement plan is governed by any of the listed Internal Revenue Code sections and it properly follows all the requirements in such section, then the spendthrift provision included in that plan is enforceable under Georgia law. If the spendthrift provision is enforceable under Georgia law, then the

retirement plan does not become property of the estate pursuant to § 541(c)(2). For example, in *Hipple*, the court held that an SEP–IRA was not property of the bankruptcy estate pursuant to § 541(c)(2). *In re Hipple*, 225 B.R. at 815. The court relied on the predecessor to O.C.G.A. § 53–12–80(g) as the applicable nonbankruptcy law and found that the relevant retirement plan established in accordance with § 408 of the tax code had a valid and enforceable spendthrift provision. *Id.* This Court agrees that § 53–12–80(g) is "applicable nonbankruptcy law" as referred to in § 541(c)(2). In *Hipple*, because the plan was an SEP–IRA, the court looked to § 408, the section that governed that type of retirement account; however, the Plan in this case is a profit-sharing plan which is governed by § 401 of the Internal Revenue Code, and as such the Court will look to § 401.

Therefore, whether or not the Plan is property of the bankruptcy estate hinges on whether it is a qualified plan under 26 U.S.C. § 401.[5] If it is qualified under § 401 then the anti-alienation provision is enforceable under Georgia law and the Plan does not become property of the estate pursuant to § 541(c)(2). In contrast, if the Plan is not qualified, then the anti-alienation provision is not enforceable under applicable nonbankruptcy law, the Plan becomes property of the estate, and the Court must then determine whether Mr. Rogers is entitled to exempt it.

---

**5.** A plan that is not covered by ERISA may still be qualified under § 401 of the Internal Revenue Code so as to receive certain tax benefits. ERISA governs employee benefit plans under certain conditions. The Internal Revenue Code, among other titlings, establishes the tax consequences for retirement accounts based on whether certain requirements are met, and it does this regardless of whether a plan is subject to ERISA. A profit-sharing plan may be qualified under § 401 of the Internal Revenue Code regardless of whether it is ERISA qualified. ERISA is a separate federal statute which is relevant to this discussion only as a potential applicable federal nonbankruptcy law that would result in the Plan not becoming property of the estate pursuant § 541(c)(2), but it does not apply to the Plan in this case. Whether the Plan is qualified under § 401 such that its anti-alienation provision is enforceable under Georgia law is a separate analysis.

## B. Plan Qualification

A qualified profit-sharing plan is, among other things, a definite written program communicated to employees and established and maintained by an employer to allow employees "to participate in the profits of the employer's trade or business." 26 CFR § 1.401–1(a)(2)(ii). To become qualified, and thus exempt from taxation, a profit-sharing plan must meet certain criteria provided in § 401. In determining if a plan is qualified, courts must look beyond the form of the plan and examine how the plan is actually operated. *In re Blais,* No. 93–32191–BKC, 2004 WL 1067577, at *3 (Bankr.S.D.Fla.2004).

RES–GA argues that the Plan is not qualified because it violates various requirements under § 401, including a distribution requirement, the anti-alienation provision, the exclusive benefit rule, and it claims that various prohibited transactions under § 4975 occurred sufficient to disqualify the Plan.

### 1. Distribution

RES–GA first argues that the form of the Plan is not sufficient to qualify the trust because it does not provide for certain required distributions. Section 401(a)(9) provides guidelines for required distributions. In order to be a qualified trust, a plan must require that the entire interest of each employee will be distributed not later than: (a) the "required beginning date" or (b) "beginning not later than the required beginning date, over the life of such employee or over the lives of such employee and a designated beneficiary." 26 U.S.C. § 401(a)(9)(A). Section 401(a)(9)(C) provides the "required beginning date" to be April 1 of the calendar year following the later of: (1) the calendar year in which the employee attains age 70 ½ if the employee is a "5–percent owner . . . with respect to the plan year ending in the calendar year in which the employee

attains age 70 ½," or (2) if the employee is not a "5–percent owner," the later of April 1 of the calendar year following the calendar year in which he or she attains age 70½ or retires. 26 U.S.C. § 401(a)(9)(C). RES–GA argues that the Plan is not qualified because it does not contain this requirement that the distributions occur by the "required beginning date." (RES–GA's Mot. 10; RES–GA's First Reply 5). To counter that point, Mr. Rogers points to Article VI of the Plan Summary which states "[i]f you remain employed past your Normal Retirement Date, benefits will be deferred until you actually terminate employment and request them; however, in some cases payment must begin upon your attainment of age 70 ½." (Rogers' Brief in Support of Mot. for Summ. J. ("Rogers' Mot.") 7–8, Doc. 65; RES–GA's Mot. Ex. C, at 14). In addition, contrary to RES–GA's assertions, the Plan Summary also states:

> You may delay the distribution of your vested account balance. However, if you elect to delay the distribution of your vested account balance, there are rules that require that certain minimum distributions be made from the Plan. If you are a 5% owner, distributions are required to begin not later than the April 1st following the end of the year in which you reach age 70 ½. If you are not a 5% owner, distributions are required to begin not later than April 1st following the later of the end of the year in which you reach age 70 ½ or retire.

(RES–GA's Mot. Ex. C, at 16). While the Court does not have the actual plan document before it, it appears that the Plan does contain the required distribution clause based on the Plan Summary.

### 2. Anti-alienation

Section 401(a)(13) requires a plan to include an anti-alienation provision in which

the benefits under the plan cannot be assigned or alienated. RES–GA argues that the operation of the Plan is in violation of the anti-alienation provision because Mr. Rogers is using the funds for his personal living expenses and borrowing money from the Plan.

Section 401(a)(13) states that a trust cannot be qualified if the plan does not provide "that benefits provided under the plan may not be assigned or alienated." "[A] loan made to a participant ... shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 ... by reason of section 4975(d)(1)." Section 4975 imposes an excise tax on disqualified individuals that engage in certain prohibited transactions. But because the definition of prohibited transaction is broad, § 4975(d)(1) also exempts from taxation prohibited transactions under certain circumstances, including

> any loan made by the plan to a disqualified person who is a participant or beneficiary of the plan if such loan—(A) is available to all such participants ... on a reasonably equivalent basis, (B) is not made available to highly compensated employees ... in an amount greater than the amount made available to other employees, (C) is made in accordance with specific provisions regarding such loans set forth in the plan, (D) bears a reasonable rate of interest, and (E) is adequately secured.

Section 4975(f)(6) then provides exceptions to the exemptions in (d)(1). However, a loan made to Mr. Rogers in this case does not come within the exceptions to the exemptions.[6]

The Court is unable to rule as a matter of law whether the way in which the Plan has been operated violates the anti-alienation provision based on the evidence that is before it. Mr. Rogers contends that the money he has used for his personal living expenses were distributions in compliance with the Plan. However, he has the burden of proof to show the Plan is not property of the estate. In light of RES–GA's contentions, mere arguments that the use of the funds for his personal living expenses were proper distributions are not sufficient without at least some evidence to show that they actually were proper distributions.

The Court is unaware of whether the funds used for Mr. Rogers' personal living expenses beginning in 2012 were treated as loans or distributions, or neither. If they were treated as loans, then whether the loans to Mr. Rogers result in a violation of § 401(a)(13) depends upon whether they were made in accordance with the requirements in the Plan,[7] have a reasonable rate of interest, and are adequately secured in accordance with § 4975(d)(1). If they were treated as distributions, then whether they were proper distributions and taxed appropriately would become relevant.

---

**6.** Pursuant to § 4975(f)(6), if a plan providing contributions to an owner-employee, among other things, lends any part of the plan to such owner-employee, such transaction is not exempt under (d)(1). The term owner-employee, for purposes of this subsection only, includes a shareholder-employee—an employee of an S corporation who owns more than five percent of the stock—except that the term owner-employee does not include a shareholder-employee for purposes of a loan to an owner-employee. 26 U.S.C. § 4975(f)(6)(A)-(C).

**7.** The Court notes that some representations have been made that participant loans were not permissible under the Plan document until 2014.

### 3. Exclusive Benefit Rule

RES–GA next argues that the plan is not qualified because the way in which it has been operated violates the "exclusive benefit rule." The "exclusive benefit rule" is contained in § 401(a)(2) and states that a trust will not be qualified unless under the trust instrument "it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ..: used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries." "[T]he phrase 'if under the trust instrument it is impossible' means that the trust instrument must definitely and affirmatively make it impossible for the nonexempt diversion or use to occur ... by any ... means." 26 C.F.R. § 1.401–2(a)(2). "[T]he phrase 'purposes other than for the exclusive benefit of his employees or their beneficiaries' includes all objects or aims not solely designed for the proper satisfaction of all liabilities to employees or their beneficiaries covered by the trust." 26 C.F.R. § 1.401–2(a)(3). This requirement is not construed liberally; it does not prohibit others from benefitting from a transaction "as long as the primary purpose of the investment is to benefit employees or their beneficiaries." *Shedco, Inc. v. Commissioner of Internal Revenue*, T.C. Memo.1998–295, at 9 (1998). A court must look at all the facts and circumstances to determine whether a plan has been operated for the exclusive benefit of employees. *Shedco, Inc. v. Commissioner of Internal Revenue*, T.C. Memo.1998–295, at 11 (1998).

Under certain circumstances, "improper trust administration and investment policies may result in violations of the exclusive benefit rule." *Westchester Plastic Surgical Associates, P.C. v. CIR*, T.C.

Memo 1999–369, at *11 (1999). The investment philosophy of a trust may be so adverse to the interests of employees that it results in a plan being no longer operated in accordance with the exclusive benefit rule. *See, e.g., Id.*; *Winger's Dep't Store, Inc. v. Commissioner of Internal Revenue*, 82 T.C. 869, 877–78 (1984); *Shedco, Inc. v. Commissioner of Internal Revenue*, T.C. Memo.1998–295, at 11 (1998). "When plan assets are borrowed inappropriately from the plan for the benefit of the employer or the employer's principals, the Exclusive Benefit Rule is violated by the use of such funds for purposes other than funding plan benefits." *In re Blais*, 2004 WL 1067577, at *4. A plan covering only one employee does not violate the exclusive benefit rule unless it is "designed or operated as a means of siphoning profits to a shareholder employee." Rev. Rul. 72–4 (Jan. 1, 1972); *see also* 26 C.F.R. § 1.401–1(b)(3). In addition, using a plan as a tax advantageous personal checking account, not for retirement purposes, is a violation of the exclusive benefit rule. *Westchester Plastic Surgical Associates, P.C.*, T.C. Memo. 1999–369, at *11–12 ("[T]he entire investment philosophy of the Defined Benefit Plan was aimed not at providing benefits for the employees but at making capital available to Morrissey ... [t]he manipulation of pension plan assets by a trustee who is also the sole shareholder of the plan sponsor is a clear example of an exclusive benefit rule violation."). A plan is not operated in accordance with the exclusive benefit rule when it is managed for the immediate benefit of the sole trustee and participant as opposed to for the retirement benefit of the participant. *Id.* at *11.

When considering whether a plan is being operated for the exclusive benefit of employees in accordance with § 401(a)(2), courts may look to the ERISA prudent investor standard for fiduciary behavior even if a plan is not an ERISA governed

plan. *Shedco, Inc. v. Commissioner of Internal Revenue,* T.C. Memo.1998–295, at 12 (1998); *Westchester Plastic Surgical Associates, P.C. v. CIR,* T.C. Memo 1999–369, at *6 (1999). Under such standard, a fiduciary should discharge his duties for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1). They must do this "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* In so doing, while developing an investment philosophy and making investments, a fiduciary should operate the trust in accordance with plan documents and consider things such as the diversification of the investments to minimize risk of loss, the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan, and the projected return of the portfolio relative to the funding objectives of the plan. *Id.;* 29 C.F.R. § 2550.404a–1(b). Revenue Ruling 69–494, although not binding, is further relevant guidance courts may look to when determining whether the prudent investor requirements have been met. *Westchester Plastic Surgical Associates, P.C. v. CIR,* T.C. Memo 1999–369, at *7 (1999). It provides certain guidelines that, if followed, suggest an investment is consistent with the exclusive benefit rule:

> (1) the cost must not exceed the fair market value at the time of the purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present.

Rev. Rul. 69–494 (1969). "[T]he ultimate outcome of an investment is not proof that the investment failed to meet the prudent investor rule." *Westchester Plastic Surgical Associates, P.C. v. CIR,* T.C. Memo 1999–369, at *7–8 (1999). Instead, the conduct of the fiduciary in selecting investments is the focus of the inquiry. *Id.* at *7.

RES–GA asserts that the exclusive benefit rule was violated when Mr. Rogers discontinued his employment with ProStar Properties because "there is no way the Plan could have been maintained for the exclusive benefit of employees and beneficiaries, since there were no employees." (RES–GA's Second Reply 6). However, contrary to RES–GA's assertion, a plan covering only former employees may still be qualified as long as it complies with the other requirements of § 401. *See* 26 C.F.R. § 1.401–1(b)(4). RES–GA also argues the exclusive benefit rule was violated by Mr. Rogers using the Plan's checking account as a personal bank account and paying his personal living expenses from it. Further, it argues that the loan to Smokehouse Properties, as well as Mr. Rogers living in the Flowery Branch Property and causing the Plan to purchase the Boat for his personal use on Lake Lanier, all violate the exclusive benefit rule.

The Court again has insufficient evidence before it to determine this issue on a request for summary judgment. Information regarding whether the funds used for Mr. Rogers' living expenses were treated as distributions, loans, or neither, is important in determining whether the exclusive benefit rule has been violated. If the funds were proper distributions under the Plan and treated accordingly for tax purposes, then they were being used to fund the liabilities to the sole participant in accordance with the Plan, which is precisely what the exclusive benefit rule is intend-

ed to protect. On the hand, if the funds were treated as loans, then in order to grant judgment as a matter of law, the Court needs some evidence as to whether the Plan documents were followed, how much was borrowed, the liquidity of the assets when the loans were made, and the terms of the loan(s). And, if the use of the funds was not treated as a distribution or loan by the Plan or for tax purposes, then it would suggest that Mr. Rogers was using the Plan's bank account like a personal checking account and abusing the form of the profit sharing plan.

Furthermore, the Court does not have enough evidence before it about the Smokehouse Properties loan. In particular, there is insufficient evidence about who owns Smokehouse Properties,[8] what, if any, benefits Mr. Rogers received by making the loan, what considerations were taken into account when making the loan, or any terms of the loan, but we do know that no payments have been made. (RES–GA's Second Reply Ex. B, at 4). The Court also does not have enough information about the Boat purchase. According to Mr. Rogers, the Boat was purchased for a price below fair market value and he immediately put it on the market to sell. Mr. Rogers also used the Boat for his personal enjoyment on Lake Lanier. At a minimum the Court needs some sort of evidence regarding what efforts were made to try and sell the Boat to determine whether the Boat was purchased as an investment or as a way for Mr. Rogers to have a boat for his own personal use and enjoyment without consideration of the Plan's liabilities.

The Court cannot determine with the evidence before it whether the overall investment philosophy was a way to benefit Mr. Rogers presently and, in essence, abusing the form and tax advantages of a profit sharing plan, or whether it was an attempt to make prudent investments that may have benefitted Mr. Rogers presently in some ways, but were really meant to ensure it could fulfill the liabilities it owed to Mr. Rogers in the future. Accordingly, the Court cannot grant judgment as a matter of law on this issue, either.

### 4. Section 4975 Prohibited Transactions

Last, RES–GA argues that the Plan has engaged in various transactions with disqualified individuals prohibited by § 4975 such that the Plan should be disqualified. Under certain circumstances, an IRA may be disqualified upon the happening of one § 4975 prohibited transaction. *See* 26 U.S.C. § 408(e)(2). However, the same rule does not apply to profit sharing plans; instead, certain excise taxes are imposed on the disqualified person for each prohibited transaction with a profit sharing plan. 26 U.S.C. § 4975(a)-(b).

Section 4975(c) provides a list of instances in which a prohibited transaction with a disqualified person may occur:

> (1) General rule.—For purposes of this section, the term "prohibited transaction" means any direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between a plan and a disqualified person;
>
> (B) lending of money or other extension of credit between a plan and a disqualified person;

---

**8.** RES–GA points to a portion of Mr. Rogers' Rule 2004 Examination wherein he makes a reference to his mother-in-law, but it is not at all clear from the cited portion of the deposition that she is the owner of Smokehouse

Properties, especially because RES–GA argues it is an entity owned by Mr. Rogers' spouse. (RES–GA's Second Reply Ex. B, at 3).

(C) furnishing of goods, services, or facilities between a plan and a disqualified person;

(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

(E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or

(F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1). The statute defines a disqualified person as:

(A) a fiduciary;[9]

(B) a person providing services to the plan;

(C) an employer any of whose employees are covered by the plan;

(D) an employee organization any of whose members are covered by the plan;

(E) an owner, direct or indirect, of 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

(ii) the capital interest or the profits interest of a partnership, or

(iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D);

(F) a member of the family (as defined in paragraph (6)) of any individual described in subparagraph (A), (B), (C), or (E);[10]

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,

(ii) the capital interest or profits interest of such partnership, or

(iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or

---

**9.** "For purposes of this section, the term "fiduciary" means any person who—

(A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(B) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(C) has any discretionary authority or discretionary responsibility in the administration of such plan." 26 U.S.C. § 4975(e)(3).

**10.** "For purposes of paragraph (2)(F), the family of any individual shall include his spouse, ancestor, lineal descendant, and any spouse of a lineal descendant." 26 U.S.C. § 4975(e)(6).

(I) a 10 percent or more (in capital or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G).

26 U.S.C. § 4975(e)(2). "In adopting the list of prohibited transactions, Congress intended 'to prevent taxpayers involved in a qualified retirement plan from using the plan to engage in transactions for their own account that could place plan assets and income at risk of loss before retirement.'" *In re Kellerman,* 531 B.R. 219, 225 (Bankr.E.D.Ark.2015) (quoting *Ellis v. Comm'r,* 106 T.C.M. (CCH) 468 (U.S.Tax. Ct. Oct. 29, 2013)). "Thus, the fact that a transaction would qualify as a prudent investment when judged under the highest fiduciary standards is of no consequence." *Id.* (citations and internal quotation marks omitted).

RES–GA argues that one prohibited transaction alone is sufficient to disqualify the Plan. Generally, the occurrence of a prohibited transaction does not disqualify a profit sharing plan and this Court will not hold otherwise. However, this Court agrees with the courts that have held that if a multitude of prohibited transactions exist, such that the form of the profit sharing plan is being abused, then the plan may no longer be qualified. *See In re Daniels,* 452 B.R. 335 (Bankr.D.Mass. 2011), *aff'd,* 736 F.3d 70 (1st Cir.2013); *In re Bennett,* No. 12–60642–tmr7, 2013 WL 4716180 (Bankr.D.Ore. Sept. 3, 2013). For example, in *Daniels,* the debtor was found to have abused the form of the profit sharing plan because he admitted that he routinely used the funds in his retirement account for the benefit of his family and other disqualified persons. *In re Daniels,* 452 B.R. at 350–51. It was evident that participation in such transactions was the routine manner by which he managed the assets held in his profit sharing plan, the consequence of which was that the funds

held therein were not exempted from the bankruptcy estate. *Id.*

In analyzing this issue, the Court concludes that Mr. Rogers is a disqualified person within the meaning of § 4975 because he is, among other things, a fiduciary. RES–GA argues that Mr. Rogers living in the Flowery Branch Property and using the Boat for his personal use are both prohibited transactions. Both of these instances do appear to be prohibited transactions for various reasons. For example, both of these are instances in which Mr. Rogers, a disqualified person, is or was using plan assets for the benefit of himself personally. Mr. Rogers was able to live rent free in the Flowery Branch Property and he was able to use the Boat for his own personal enjoyment on Lake Lanier, both of which are prohibited transactions under § 4975(c)(1)(C) and (D). Next, RES–GA points to the contribution or loan of $11,000 made by Mr. Rogers' step-daughter to the plan. Step children are not included in the definition of a member of the family as a disqualified person. RES–GA has not pointed to any authority that indicates step family should be considered within the definition of family for these purposes, and the Court has been unable to find authority supporting that position. The Court cannot conclude as a matter of law that this was a prohibited transaction.

RES–GA also argues that loans made to Mr. Rogers as a participant were prohibited transactions. As an initial matter, the Court does not have evidence that Mr. Rogers actually borrowed money from the Plan. Even if he did, as discussed *supra* Part B.2., § 4975(d)(1) contains certain exemptions in which something that would otherwise be considered a prohibited transaction is not. The Court incorporates that discussion here regarding whether any loans made to Mr. Rogers constituted

a prohibited transactions. A loan made to a participant may or may not be a prohibited transaction depending on whether certain requirements are met. Because the Court does not have sufficient evidence before it, it cannot conclude that the alleged loans made to Mr. Rogers were prohibited transactions. In addition, whether Mr. Rogers was taking proper distributions or not when using funds from the Plan to pay his living expenses is relevant to determine whether he was involved in various prohibited transactions.

Last, RES–GA asserts that Mr. Rogers' remodeling of the Flowery Branch Property was a prohibited transaction. Mr. Rogers personally received an indirect benefit from remodeling the Flowery Branch Property because he was able to live in the remodeled home rent free for a time. This falls within the category of a prohibited transaction because Mr. Rogers, a disqualified person, provided services to the Plan and received a benefit for those services outside of the Plan. *See In re Cherwenka*, 508 B.R. 228, 236–37 (Bankr.N.D.Ga.2014). However, because of a lack of evidence before the Court, it cannot determine the extent of all of the prohibited transactions that occurred and whether or not Mr. Rogers abused the form of the profit sharing such that it is no longer qualified.

In light of RES–GA's allegations, material questions of fact still exist as to whether the Plan is qualified. As such, the Court cannot grant judgment as a matter of law on the issue of whether the Plan is property of the bankruptcy estate.

### C. Exemptions

■ Mr. Rogers also alleges that even if the Plan is property of the bankruptcy estate he is entitled to exempt it under both Georgia law and the Bankruptcy Code. "Generally speaking, courts construe bankruptcy exemption statutes—both state and federal—liberally in favor of bankruptcy debtors." *McFarland v. Wallace (In re McFarland)*, 790 F.3d 1182, 1186 (11th Cir.2015). When a party objects to a debtor's exemption, Federal Rule of Bankruptcy Procedure 4003(c) states that the burden of proof is on the party objecting to the exemptions. Fed. R. Bankr.P. 4003(c).

### 1. O.C.G.A. § 44–13–100(a)(2.1)

Section 44–13–100(a)(2.1) provides four different avenues by which a debtor may exempt his or her aggregate interest in funds or property held in a retirement or pension plan. First, a retirement or pension plan may be exempted if it is maintained for public officers or employees of Georgia or a political subdivision thereof and is at least partially supported by public funds of Georgia or a political subdivision. O.C.G.A. § 44–13–100(a)(2.1)(A). Second, a retirement or pension plan that is maintained by a nonprofit corporation and is at least partially supported by funds of the nonprofit corporation may be exempted. O.C.G.A. § 44–13–100(a)(2.1)(B). Third, "[t]o the extent permitted by the bankruptcy laws of the United States, similar benefits from the private sector of such debtor shall be entitled to the same treatment as [those above] provided that the exempt or nonexempt status of periodic payments from such a retirement or pension plan or system shall be as provided under [O.C.G.A. § 44–13–100(a)(2)(E) ]." O.C.G.A. § 44–13–100(a)(2.1)(C). Last, "[a]n individual retirement account within the meaning of Title 26 U.S.C. Section 408" O.C.G.A. § 44–13–100(a)(2.1)(D).

Neither party asserts that the state of Georgia or a nonprofit corporation maintains the Plan, nor that this is an IRA within the meaning of 26 U.S.C. § 408. Therefore, the Plan may only be exempted

under O.C.G.A. § 44–13–100(a)(2.1)(C) if it can be exempted under the Bankruptcy Code.

### 2. 11 U.S.C. § 522(b)(3)(C)

Section 522(b) allows a debtor to claim as exempt certain property from the bankruptcy estate and provides debtors with a choice between exempting property under § 522(b)(2) or (b)(3). 11 U.S.C. § 522(b)(1). Under § 522(b)(2), debtors may take the exemptions provided by the Bankruptcy Code in § 522(d). However, states may opt out of the exemptions provided in § 522(d) and Georgia is such a state that has opted out. *McFarland v. Wallace (In re McFarland)*, 790 F.3d 1182, 1185 (11th Cir.2015). Therefore, debtors in Georgia only have the option of the exemptions provided in § 522(b)(3) and under Georgia law. Of relevance here, § 522(b)(3)(C) allows debtors to exempt "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401 ... of the Internal Revenue Code of 1986." 11 U.S.C. § 522(b)(3)(C). Thus, whether Mr. Rogers may exempt the Plan also hinges on if it is a qualified plan under § 401 of the Internal Revenue Code.

Section 522(b)(4) provides further guidance on the exemption of retirement accounts pursuant to § 522(b)(3)(C). If a retirement fund "has received a favorable determination under section 7805 of the Internal Revenue Code of 1986,[11] and that determination is in effect as of the date of the filing of the petition ... those funds shall be presumed to be exempt from the estate." 11 U.S.C. § 522(b)(4)(A). But, if the retirement fund has not received a favorable determination

those funds are exempt from the estate if the *debtor* demonstrates that: (i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and (ii)(I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or (II) the retirement fund fails to be in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986 and the debtor is not materially responsible for that failure.

11 U.S.C. § 522(b)(4)(B) (emphasis added).

Mr. Rogers argues that the Plan has a favorable determination because the prototype plan adopted by ProStar Properties received a favorable opinion letter. (Rogers' Reply Brief 7). He argues that under certain IRS regulations and procedures currently in place, an opinion letter is equivalent to a favorable determination letter for this Plan and, therefore, it is presumed to be exempt pursuant to § 522(b)(4)(A). (*Id.*).

A determination letter is a written statement issued by the IRS that applies the principles and precedents that exist to a specific set of facts. Rev. Proc. 2015–4, § 3.04; *see also* 26 C.F.R. § 601.201(a)(3). Determination letters may contain the opinion of the IRS as to the qualification of a particular plan involving the provisions of §§ 401 and 403(a) and the status of a related trust. 26 C.F.R. § 601.201(c)(5); Rev. Proc. 2015–6, § 21.01 (Jan. 2, 2015). An opinion letter, on the other hand, is a written statement issued by the IRS "to a sponsor or M & P [12] mass submitter as to

---

**11.** "Section 7805 ... generally authorizes the Secretary of the Treasury to enact regulations." *Daniels v. Agin,* 736 F.3d 70, 80 (1st Cir.2013).

**12.** "M & P" means "Master and Prototype." Master and prototype plans are both form plans which sponsors make available for employers to adopt. A master plan is a plan "made available by a sponsor for adoption by employers and for which a single funding

the acceptability of the *form* of an M & P plan under § 401." Rev. Proc. 2015–4, § 3.05 (Jan. 2, 2015) (emphasis added); *see also* 26 C.F.R. § 601.201(a)(4). Employers must go through separate procedures to obtain determination letters as to any particular plan. *See* 26 C.F.R. § 601.201(*o*)(3), (q)(3)(v). The applicable regulation in the Code of Federal Regulations provides:

> Since a determination as to the qualification of a particular employer's plan can be made only with regard to facts peculiar to such employer, a letter expressing the opinion of the Service as to the acceptability of the form of a master or prototype plan will not constitute a ruling or determination as to the qualification of a plan as adopted by any individual employer nor as to the exempt status of a related trust or custodial account.

26 C.F.R. § 601.201(q)(3)(iv).

Nevertheless, under certain circumstances the IRS has concluded that a favorable opinion letter is equivalent to a favorable determination letter. If an employer adopting a plan meets certain requirements such that it can rely on that plan's favorable opinion letter, that opinion letter is equivalent to a favorable determination letter for certain purposes. Rev. Proc. 2015–36 § 19.04 (June 9, 2015); Rev. Proc. 2015–6 § 8.03 (Jan. 2, 2015). The applicable Revenue Procedure provides:

An employer adopting a standardized M & P plan may rely on that plan's opinion letter, ... if the sponsor of such plan ... has a currently valid favorable opinion letter, the employer has followed the terms of the plan(s), and the coverage and contributions or benefits under the plan(s) are not more favorable for highly compensated employees ... than for other employees.

Rev. Proc. 2015–36, § 19.01 (June 9, 2015).[13] An exception to this exists in Rev. Proc. 2015–36, § 19.03, which limits an employer's ability to rely on an opinion letter. Among other things, "[a]n adopting employer has no reliance if the employer's adoption of the plan precedes the issuance of an opinion or advisory letter for the plan," Rev. Proc. 2015–36, § 19.03(2) (June 9, 2015).

The only document the Court has before it related to this issue is an opinion letter for a plan described as a "Prototype Nonstandardized Profit Sharing Plan" (the "IRS Letter"). (*See* RES–GA's Second Reply Ex. A). However, the Adoption Agreement in this case states that the Plan is a "Standardized Profit Sharing Plan." (*See* RES–GA's Mot. Ex. B). Based on the IRS Letter, the Court cannot conclude, for purposes of these Motions, that the Plan even has a favorable opinion letter because the one presented is for a nonstandardized profit sharing plan and there is no indication it applies to the form of the "Standardized Profit Sharing Plan." Even assuming the opinion letter applies to the

medium (for example, a trust or custodial account) is established, as part of the plan, for the joint use of all adopting employers." Rev. Proc. 2015–36 § 4.01. A prototype plan is a plan "made available by a sponsor for adoption by employers and under which a separate funding medium is established for each adopting employer." Rev. Proc. 2015–36 § 4.02.

13. "An employer adopting a nonstandardized M & P ... plan may rely on that plan's opinion or advisory letter as described in section 19 if the employer's plan is identical to an approved M & P or specimen plan with a currently valid favorable opinion or advisory letter, the employer has not amended the plan other than to choose options provided under the approved plan ..., and the employer has followed the terms of the plan." Rev. Proc. 2015–36 § 19.02.

Plan, ProStar Properties adopted the Plan in 2004, but the IRS Letter states that the form to which it refers was not submitted until 2005 and the letter itself is dated 2008. According to § 19.03(2) of Revenue Procedure 2015–36, an employer may not rely on the issuance of an opinion letter that follows the employer's adoption of a plan. Therefore, based upon the evidence before the Court at this time, the Plan does not have a favorable determination or a favorable opinion letter that can be relied upon such as to be equivalent to a favorable determination.

Without a favorable determination or opinion letter that can be relied on as a favorable determination, and even assuming that the IRS Letter is a favorable opinion letter for the Plan, the Court agrees with other courts that have addressed the issue and concludes that a favorable opinion letter as to the form of a prototype plan by itself is not a sufficient "favorable determination" for purposes of § 522(b)(4)(A). *See In re Bauman*, No. 11 B 32418, 2014 WL 816407, at .*14 (Bankr. N.D.Ill. Mar. 4, 2014); *In re Daniels*, 452 B.R. 335, 347 (Bankr.D.Mass.2011). Such an opinion letter specifically states that it is *not* a determination "as to whether an employer's plan qualified under Code section 401(a)," but only addresses the acceptability of the form of the plan. (RES–GA's Second Reply Doc. Ex. A, at 1) (emphasis added). When an opinion letter is not equivalent to a favorable determination, a presumption that the Plan is exempt should not arise from a letter based solely on the form of a plan without examining the particular facts of this Plan and addressing the operation of the Plan. Furthermore, because neither party has presented a favorable opinion letter that is equivalent to a favorable determination letter, in ruling on these Motions the Court need not decide whether such a letter

would suffice as a favorable determination contemplated by § 522(b)(4).

Based on the above, in order for Mr. Rogers to obtain summary judgment on his exemption of the Plan under § 522(b)(3)(C), he must demonstrate both that the Plan is in substantial compliance with the tax code (or, if it is not, he is not responsible for its failure) and that no prior unfavorable determination has been made by a court or the IRS. 11 U.S.C. § 522(b)(4)(B). He has failed to do so by his Motion. RES–GA still maintains the overall burden of proof for the exemption to be disallowed and it has also failed to meet its burden by its Motion. As discussed previously in Part B, the Court does not have sufficient evidence by which it can conclude as a matter of law that the Plan is or is not a qualified plan under § 401. Therefore, neither party has yet met its burden to be entitled to judgment as a matter of law.

■ In summary, in order to be entitled to summary judgment that the Plan is not property of the estate, Mr. Rogers must show that the Plan is qualified under § 401. Material questions of fact exist which preclude the Court from finding, as a matter of law, that the Plan was a qualified plan under § 401 and, consequently, that it was not property of the estate. Further, because material questions of fact exist whether the Plan has received a "favorable determination" and whether the Plan is in substantial compliance with the Internal Revenue Code, and because no prior determination to the contrary has been made, Mr. Rogers is not entitled to a judgment as a matter of law that he may exempt the Plan under the Bankruptcy Code. Conversely, RES–GA has the overall burden of proof when objecting to Mr. Rogers' exemption of the Plan in this case to show that the Plan is not qualified. For purposes of these Motions, neither party

has come forth with sufficient evidence for the Court to conclude as a matter of law that the Plan is or is not qualified under § 401 or that it is or is not in substantial compliance with the tax code. Questions of fact exist regarding such issues as the following: (a) how the use of the Plans' funds for Mr. Rogers' living expenses were treated both by the Plan and for tax purposes; (b) any loans the Plan made to Mr. Rogers and the details of those loans; (c) whether any loans made to Mr. Rogers were permitted by the Plan at the time they were made and followed the requirements of the Plan; (d) the loan made to Smokehouse Properties and the details of that loan; (e) if the Smokehouse Properties loan is in default, the details of the default and any efforts Mr. Rogers has made on behalf of the Plan to collect under the loan; (f) what benefits Mr. Rogers received by making the loan to Smokehouse Properties; (g) by whom is Smokehouse Properties owned; (h) considerations Mr. Rogers took into account when making the particular investments for the Plan and details of the investments; and (i) Mr. Rogers' attempts at marketing and selling the Boat after he purchased it.

## Conclusion

For the reasons stated herein, it is hereby

ORDERED that RES–GA's Motion for Summary Judgment is DENIED, and it is

FURTHER ORDERED that Mr. Roger's Motion for Summary Judgment is DENIED.

**IT IS ORDERED.**